Gladys **PIERRE** and Nathania Lescouflair, p.p.a., **Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 83–4214–S.**

United States District Court, D. Massachusetts.

· July 11, 1990.

Jeffrey Petrucelly, Petrucelly & Nadler, Boston, Mass., for plaintiffs.

George Henderson, Asst. U.S. Atty., for defendant.

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

SKINNER, District Judge.

In this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* (FTCA), the plaintiff Gladys Pierre seeks recovery on behalf of her minor daughter Nathania Lescouflair for personal injuries and on her own behalf for medical and other expenses incurred as a result of a sale to her by the defendant of a residence contaminated with flaking lead based paint. The case was tried without a jury, but before any decision was reached, upon the representation of plaintiff's counsel that new evidence had surfaced in the discovery of a government file thought to have been destroyed, the trial was reopened. The new evidence was submitted in the form of deposition transcripts and government documents.

### FINDINGS OF FACT

In early 1978, the United States Department of Housing and Urban Development (HUD) foreclosed its mortgage on and took possession of a two family house at 165–167 Milton Ave., in the Dorchester section of Boston, Massachusetts. At the time there were two tenant families living in the house, with at least one child under the age

of six. HUD personnel knew then that the house had been built prior to 1950 and had been painted with lead based paint.

On May 5, 1978, Ms. Pierre agreed to purchase the premises from HUD for $21,-550, and HUD conveyed title to her on June 29, 1978. From that time to the present she has occupied one of the apartments in the house. At the time of the sale Ms. Pierre was single and without children.

The agreement of sale required HUD to provide a fully repaired and repainted house and to repair any structural defects occurring within one year of the closing. In fact the required repairs and repainting were not undertaken prior to the closing, but were performed by HUD between mid-September and early December, 1978. This work included scraping old paint and repainting the interior ceilings and walls and parts of the exterior. Ms. Pierre informed HUD in early 1979 that the paint was peeling again, and the house was re-painted by HUD's contractor. The paint continued to peel, and Ms. Pierre complained once more to HUD. At the time of her complaints to HUD in January, 1980, Ms. Pierre was eight months pregnant, and so informed the HUD property manager. Another HUD contractor repainted the exterior in the summer of 1980. At no time did anyone on behalf of HUD inspect the premises for lead paint or make any attempt to remove lead paint other than to scrape off peeling paint.

Ms. Pierre's daughter Nathania was born on March 11, 1980.

On or about October 6, 1982, agents of the Commonwealth of Massachusetts Lead Poisoning Prevention Program inspected the premises and found unacceptable levels of lead paint both in the interior and on the exterior of the house. Ms. Pierre called upon HUD to remove the lead paint, but it refused to do so. She had the work done herself at a cost of $4000. In one area the lead was so embedded that the only solution was to cover the surfaces with new wallboard.

In March of 1981 and again in March of 1982 Nathania was found to have elevated levels of lead in her blood. X-rays revealed the presence of chips of lead paint in her stomach. By the fall of 1982 the lead in her blood had reached critical levels, and she was hospitalized at Children's Hospital on two occasions, during which she was treated with a painful therapy called chelation. As a result of this therapy and subsequent medication and monitoring over the next two and one-half years, her lead level was reduced to normal. There was conflicting evidence from a child psychologist and a neurologist as to the permanent effect of Nathania's severe lead poisoning. I accept the testimony of Dr. Shaheen as being more probable than otherwise. In her opinion Nathania has suffered a permanent neuropsychological deficit which leaves her with subtle learning difficulties in mathematics, science and other subjects which depend upon visual memory bases, such as spelling. This is frustrating for Nathania, who is otherwise very bright, and leads to mildly disruptive behavior at home and at school. It is likely that she will need special tutoring and counselling and that her future lifetime earning capacity will be impaired, notwithstanding her relatively high level of general intelligence and ambition. The parties have stipulated that Ms. Pierre has expended $12,000 for hospital and medical care for Nathania to date, and that at least $5000 more will be required for further treatment, tutoring and counselling.

In general, HUD's own manuals and regulations provided that residential housing owned or controlled by HUD should be sufficiently repaired before occupancy so that it is structurally sound and free of hazards to health and safety. The specific provisions with reference to lead paint hazards are contained in 24 CFR Part 35, reprinted as Appendix 27 to HUD's publication HM 4325.1 entitled *Property Disposition Handbook—Reconditioning Acquired Properties.*

Ms. Pierre's house was "HUD-associated housing" as defined by § 35.3(e). Subpart C of this regulation is entitled **Elimination of Lead-based Paint Hazards in HUD Associated Housing.** Under § 35.24 all immediate hazards of lead based paint must

be removed from "HUD-associated housing" by the most practicable means. All defective paint conditions are assumed to be such immediate hazards. The local HUD staff is obliged to inspect the premises to determine whether immediate lead paint hazards exist and to cause them to be removed or covered over by the methods specifically described in sub-section (3) of § 35.24. None of this was done by HUD with respect to Ms. Pierre's house, and these regulations were apparently completely ignored.

HUD also had the option of selling property with a lead paint hazard if the purchaser was notified of the presence of lead paint and was contractually bound to remove the lead paint before occupancy. These conditions were required to be in the bid documents and incorporated into the contract of sale. Ms. Pierre was not notified by HUD of the presence of lead paint prior to the sale, nor were any such conditions included in her contract. Obviously such conditions would affect the purchase price of the property.

■ Upon the birth of Nathania, Ms. Pierre became obligated under state law to remove lead based paint likely to be hazardous. I find that Ms. Pierre was not contributorily negligent in failing to comply with this state law because she was entitled to rely on HUD's representation that the premises were habitable and to assume that HUD would comply with its own regulations.

### RULINGS OF LAW

■ The plaintiff originally sought recovery on a wide range of theories, which have already been discussed at length in my memoranda and orders dated March 7, 1985, February 26, 1986 and June 2, 1988, which are incorporated herein and annexed as Appendices A, B and C. The only claim left is a claim under the FTCA for negligence. Under the FTCA the government is liable for conduct which would constitute negligence under state law if done by a private person. Massachusetts has adopted the "good Samaritan" theory of negligence, which requires even a volunteer to use due care. *Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331 (1983). The Massachusetts court apparently makes a distinction between "voluntary" and "gratuitous" undertakings, basing liability in the case of gratuitous undertakings on gross negligence only. 449 N.E.2d at 336, n. 10. The distinction presents a serious conceptual problem, because one would suppose an undertaking to be voluntary in the absence of a contractual obligation, i.e., without consideration. Apparently an undertaking is voluntary but not gratuitous if it is "an indispensable part of a bundle of services" for which consideration had been given, even though the undertaking in question has not been specifically contracted for. *Id.,* 449 N.E.2d at 336. This resolution is the only way to explain the result in *Mullins,* in which the defendant was held liable for ordinary negligence in an undertaking which was described as "voluntary" but not "gratuitous." In addition to proof of negligence the plaintiff must show either "(a) that the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of the [plaintiff's] reliance on the undertaking."

■ Under Massachusetts law, failure to comply with applicable rules and regulations is evidence of negligence. *Perry v. Medeiros,* 369 Mass. 836, 343 N.E.2d 859 (1976). Cf. *Mallen v. United States,* 506 F.Supp. 728 (N.D.Ga.1979). The defendant violated M.G.L. c. 111, § 197 with respect to the prior tenants' child under the age of six. The plaintiff can not recover on that account, however, but only on account of the defendant's violation of its duty to obey its own regulations when it repainted the premises.

The defendant asserts that the failure to remove lead paint from the plaintiff's premises was a discretionary decision beyond the reach of the FTCA. In my opinion, however, these regulations were mandatory. The discretion had been earlier exercised by the Secretary in favor of the removal of lead paint from all "HUD-associated" property. See Appendix C for a more extensive discussion of this issue.

## CONCLUSION

■ I conclude on the basis of the facts and law recited above that the defendant was negligent in the performance of a voluntary undertaking to paint the plaintiff's house. Although voluntary, I find and rule that this undertaking was not gratuitous, because it was part of a bundle of services for which consideration had been given. I find that the defendant's negligence increased the risk of harm and that the harm suffered by the plaintiff was the result of her reasonable reliance on the defendant's undertaking. Accordingly I award the plaintiff on her own account damages in the amount of $4000 for the cost of deleading the premises and $17,000 for the past and reasonably predictable medical and rehabilitative expenses incurred on behalf of her minor daughter. I award the plaintiff the sum of $225,000 as next friend of Nathania Lescouflair, to compensate Nathania for her suffering to date and for a lifetime of permanent neuropsychological damage, recognizing that the quantification of damage of the sort described in the testimony is necessarily inexact. I find and rule that the plaintiff was not negligent in relying on HUD's undertaking and accordingly find for the plaintiff on the defendant's counterclaim.

## ORDER FOR JUDGMENT

Judgment shall forthwith enter for the plaintiff on her own account in the amount of $21,000, and on account of Nathania Lescouflair in the amount of $225,000, plus costs but without interest, which can not be recovered under the FTCA. Judgment shall enter for the plaintiff on the defendant's counterclaim.

## APPENDIX A

## MEMORANDUM AND ORDER

### March 7, 1985

This case arises out of the sale of a house by the defendants to one of the plaintiffs, Gladys Pierre. Plaintiffs allege that the defendants' failure to remove, cover, inspect for, or warn of, lead-based paint on the premises caused injuries to Ms. Pierre and her daughter. The complaint asserts claims for breach of express and implied warranties, breach of statutory duties imposed by the Lead–Based Paint Poisoning Prevention Act ("LBPPPA"), 42 U.S.C. §§ 4821 et seq., the National Housing Act ("NHA"), 12 U.S.C. §§ 1701 et seq., and M.G.L. c. 111, § 197, negligence, negligent and intentional infliction of emotional distress and seeks declaratory relief under 28 U.S.C. § 2201. Plaintiffs have alleged damages of approximately $3,500,000.00. The defendants have moved to dismiss plaintiffs' complaint.

In May 1978, Gladys Pierre purchased a house from HUD. At that time, she had no children. Her daughter, Nathania Lescouflair, was born approximately two and one-half years after the sale. In the fall of 1982, Ms. Pierre discovered that her daughter was suffering from lead poisoning as the result of ingesting lead-based paint that had been used on the interior and exterior of her home prior to her purchase in 1978. Plaintiffs allege that Nathania suffered organic brain damage which "will retard her future educational, social, vocational and intellectual development". The contract of sale is alleged to contain "an express warranty that the home would be habitable and free of defects when sold, and would be guaranteed by defendants for a period of at least one year".

The defendants initially moved to dismiss plaintiffs' claim for breach of express warranty on the ground that, because the express warranty claim is a contractual claim against the United States in excess of $10,000.00, exclusive jurisdiction lies with the Court of Claims. 28 U.S.C. §§ 1346(a)(2) and 1491. In the course of the exchange of arguments, plaintiffs clarified their position that the claim "for breach of express warranty ... is for $4,000.00" and, therefore, within the jurisdiction of this court under "either 28 U.S.C. § 1346(a)(2) or § 1346(b)". In a footnote to their reply memorandum, defendants conceded that since plaintiffs' "express warranty claim seeks damages of less than $10,000 ..., it appears that this court has jurisdiction to decide this claim". Because this court has

jurisdiction of plaintiffs' express warranty claim under 28 U.S.C. § 1346(a)(2), I DENY defendants' motion to dismiss insofar as they still urge it.

The defendants have also moved to dismiss plaintiffs' claim for breach of the warranty of habitability implied in the contract of sale under their reading of Massachusetts law. The defendants argue that no such warranty exists in a contract for the sale of realty and, alternatively, even if it does exist, plaintiffs' action must be brought in the Court of Claims because it states a claim in contract against the United States in excess of $10,000.00.

The Supreme Judicial Court of Massachusetts has not expressly decided whether a warranty of habitability should be implied into a contract for the sale of realty. *Albano v. Western Const. Corp.*, 357 Mass. 647, 260 N.E.2d 212 (1970). Nor have they determined, obviously, whether such a claim sounds in tort, as plaintiffs contend, or in contract. The Supreme Judicial Court has read a warranty of habitability into the lease of residential realty. *Boston Housing Authority v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831 (1973); *Ingalls v. Hobbs*, 156 Mass. 348, 31 N.E. 286 (1892). My analysis of these opinions, however, shows both that the warranty implied sounds in contract and, further, that it is inapplicable to a contract for the sale of realty.

In *Ingalls v. Hobbs, supra*, the Massachusetts court first recognized the distinction between the short-term lease of residential real property and the more traditional forms of conveyance such as fee simple and fee tail. Analogizing the residential lease to a contract for the use of property and further services of the landlord in maintaining the property, the court held that the reasonable expectations of society require all such "conveyances" to include a warranty that the premises leased would be fit for human habitation.

The contractual basis of the warranty first applied in *Ingalls* was reaffirmed and amplified in the recent decision of *Boston Housing Authority v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831 (1973). There, the court formally adopted the view (as expressed by the state legislature) that "rent is paid for habitable premises and not for an interest in real estate". 363 Mass. at 198–9, 293 N.E.2d at 843. This decision was rendered with explicit recognition of the "modern view ... that a lease is essentially a *contract* between the landlord and the tenant ..." *Id.* (emphasis added)

Plaintiffs point out that certain Massachusetts products liability cases have recognized an analogy between recovery under the Restatement (Second) of Torts § 402A and under contractual warranties, such as the warranty of merchantability, but the court has carefully preserved the distinction. *Back v. The Wickes Corp.*, 375 Mass. 633, 640, 378 N.E.2d 964, 969 (1978). Indeed, our Court of Appeals has warned that courts should be wary of "attempts to cast a contract dispute in different terms so as to subject it to the jurisdiction of the district court". *American Science and Engineering, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir.1978).

Moreover, the relevant case law indicates that the Massachusetts high court would not extend the implied warranty of habitability into the area of real estate sales. The rule of *caveat emptor* in the area of residential leases was abandoned both because "the essential purpose of the lease was not the transfer of an interest in land but the use of the demised premises for immediate occupation", *Hemingway*, 363 Mass. at 191, 293 N.E.2d at 838, and because a short term tenant cannot reasonably be expected to invest time and money in renovating such premises. Obviously, these considerations do not apply to the purchase of a house. Thus, case law does not support extending the implied warranty of habitability into a contract for the sale of a house. Accordingly, defendants' motion to dismiss plaintiffs' claim for breach of an implied warranty of habitability is ALLOWED for lack of subject matter jurisdiction, or alternatively, for failure to state a claim upon which relief can be granted.

Defendants argue that plaintiff's count alleging "statutory claims" under the LBPPPA and NHA should be dismissed because any cause of action asserted thereunder properly belongs in the Court of Claims, and alternatively, because neither the NHA nor the LBPPPA provides plaintiffs with a private right of action.

United States District Courts have "original jurisdiction of all civil actions arising under the ... laws ... of the United States", including, of course, acts of Congress. 28 U.S.C. § 1331. The Court of Claims exercises jurisdiction over "any claim against the United States founded ... upon ... any Act of Congress ..." 28 U.S.C. § 1491(a)(1). Further, District Courts have jurisdiction concurrently with the Court of Claims over civil actions (other than torts) brought against the United States, founded upon any act of Congress in which the amount in controversy does not exceed $10,000.00. 28 U.S.C. § 1346(a)(2). Because plaintiffs' claim for breach of statutory duties alleges damages well in excess of $10,000.00, the first issue to be decided is whether those claims "arise under" or are "founded upon" either the NHA or the LBPPPA.

In *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), the United States Supreme Court stated that, for a claim to be cognizable under 28 U.S.C. § 1491, (i.e., "founded upon" a federal law) it "must be one for money damages against the United States ... [citation omitted] and the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained'." *Id.,* 103 S.Ct. at 2968. (citations omitted). The Court added in a footnote that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication'." *Id.* at n. 16. (citations omitted). Thus, a cause of action is deemed "founded upon" an act of Congress, within the meaning of 28 U.S.C. § 1491, when that act grants the claimant, either expressly or by implication, the right

to recover money damages. *Id.; see also, Ralston Steel Corp. v. United States,* 340 F.2d 663, 169 Ct.Cl. 119 (1965), *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

In their memorandum, plaintiffs correctly point out that not every monetary claim against the United States invoking rights or privileges granted by acts of Congress is sufficiently "founded upon" federal law so as to come within the jurisdiction of the Court of Claims. *See, e.g., B.K. Instrument, Inc. v. United States,* 715 F.2d 713 (2d Cir.1983). The distinction between claims "arising under" federal law and claims "founded upon" federal law is not clear. In one of the leading cases in this area, *Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967), it was determined that the Court of Claims does not have jurisdiction over claims based to some degree upon "the Constitution, a [federal] statute, or a regulation ... but in which some other principle of damages has to be invoked for recovery". *Id.,* 372 F.2d at 1008. Those claims, presumably, "arise under" federal law and are governed by 28 U.S.C. § 1331.

Courts have differed over the proper interpretation of both 28 U.S.C. § 1491 and the *Eastport* decision. *See, Davis v. Romney,* 490 F.2d 1360 (3d Cir.1974). For the following reasons, however, it is my opinion that plaintiffs' claim under the NHA and the LBPPPA comes within the exclusive jurisdiction of the Court of Claims.

Although plaintiffs do not argue that the statutes sued upon expressly mandate compensation by the federal government, they do contend that "the LBPPPA creates an implied right of action for damages". Plaintiffs thus seek recovery pursuant to a right of action implied under an act of Congress. They do not base their claims on any other extrinsic legal grounds as required by the *Eastport* decision. It therefore seems clear that plaintiffs' statutory claim is "founded upon" an act of Congress and properly belong in the Court of Claims. *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 28 U.S.C. § 1491. Accordingly, defendants' motion to dismiss

this count of plaintiffs' complaint is ALLOWED.

Defendants initially argued that plaintiffs' negligence claim should be dismissed because, they asserted, that claim is "in reality, [a] contract action...." In their reply memorandum, defendants "have conceded that liability under [the "good samaritan" or gratuitous undertaking] ... doctrine may be appropriate under certain circumstances ... [but that] plaintiffs have failed to plead any of the requisite elements of this cause of action. (citation omitted)." Specifically, defendants note plaintiffs' failure to allege that (1) defendants' conduct increased the risk of harm to plaintiffs, and (2) plaintiffs suffered harm because of their reliance on defendants' undertaking.

In their reply, plaintiffs state that they have "amended their complaint to allege the requisite elements of the gratuitous undertaking doctrine". In my opinion, plaintiffs have, by their amendment, overcome the pleading deficiency that formed the basis for defendants' motion to dismiss. *See, Block v. Neal,* 460 U.S. 289, 297–8, 103 S.Ct. 1089, 1093–94, 75 L.Ed.2d 67 (1983). Accordingly, the defendants' motion to dismiss plaintiffs' negligence count is DENIED.

Defendants have also moved to dismiss Ms. Pierre's claim for both negligent and intentional infliction of emotional distress stated in count five of the complaint. It is settled, until Congress chooses to amend 28 U.S.C. § 2680(h) to provide additional exceptions to the Federal Tort Claims Act, that claims for infliction of emotional distress may be maintained against the United States and its representatives. *Gross v. United States,* 676 F.2d 295, 303–4 (8th Cir.1982); 28 U.S.C. §§ 1346(b) and 2680(h).

An action under the Federal Tort Claims Act, however, incorporates the requirements of applicable state torts. 28 U.S.C. § 1346(b); *Zabala Clemente v. United States,* 567 F.2d 1140, 1143 (1st Cir.1978). Under *Payton v. Abbott Labs, Inc.,* 386 Mass. 542 [540], 437 N.E.2d 171 (1982), a plaintiff may not recover for negligent infliction of emotional distress unless such distress is accompanied by objective physical symptomatology and substantiated by expert medical testimony. Ms. Pierre has not alleged any physical symptoms of her own sufficient to support a claim under the rule in *Payton.* There are also no facts alleged in the complaint to sustain her conclusory allegation of intentional infliction of emotional distress. Accordingly, the defendants' motion to dismiss that count is ALLOWED.

Although defendants in their motion state that they seek to dismiss plaintiffs' complaint in its entirety, they have not addressed plaintiffs' claim for declaratory relief under 28 U.S.C. § 2201. Because the parties have not specifically asked me to rule upon that issue, I will refrain from so doing.

A final matter concerns plaintiffs' claim for breach of statutory duty arising under M.G.L. c. 111, § 197. A reading of the plain language of the statute shows that it is facially inapplicable to the facts of this case. To paraphrase the statute insofar as relevant, it provides that "[w]henever any such residential premises containing ... dangerous levels of lead undergoes a change of ownership and as a result thereof, a child ... under six will become a resident therein, *the new owner* shall remove or cover said paint ... so as to make it inaccessible to such children". (emphasis added). Clearly, M.G.L. c. 111, § 197 places the duty to remove the lead paint upon the new owner, not the vendor. Accordingly, defendants' motion to dismiss plaintiffs' claim under the Massachusetts statute discussed above is ALLOWED.

*Summary.*

Defendants' motion to dismiss is ALLOWED as to plaintiffs' claim for breach of implied warranty, recovery under the LBPPPA, NHA and M.G.L. c. 111, § 197, and negligent and intentional infliction of emotional distress. The defendants' motion is DENIED as to plaintiffs' claims for breach of express warranty and negligence.

APPENDIX B

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION
TO AMEND

February 26, 1986

This action arises out of the sale of a house by the defendants to one of the plaintiffs, Gladys Pierre. Plaintiffs allege that the defendants' failure to remove or cover lead-based paint on the premises caused injuries to Ms. Pierre and her daughter. On March 7, 1985, I dismissed plaintiffs' claims under the Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4821 *et seq.*, the National Housing Act, 12 U.S.C. §§ 1701 *et seq.*, and M.G.L. c. 111, § 197, and for breach of implied warranty and negligent and intentional infliction of emotional distress. Plaintiffs now seek to amend their complaint to reinstate the claims for negligent and intentional infliction of emotional distress. Claims for infliction of emotional distress may be maintained against the United States and its representatives in an action under the Federal Tort Claims Act. 28 U.S.C. § 1346(b); *Gross v. United States*, 676 F.2d 295, 303–4 (8th Cir.1982); *see* 28 U.S.C. § 2680(h). However, the action must meet the requirements of the applicable state tort law. 28 U.S.C. § 1346(b); *Zabala Clemente v. United States*, 567 F.2d 1140, 1143 (1st Cir.1978).

*Negligent Infliction of Emotional Distress.*

In Paragraph 42 of the proposed Third Amended Complaint, plaintiff Pierre alleges she "suffered severe emotional distress proximately caused by the actions of the defendants in failing to remove or cover the lead paint in the premises ...." Furthermore, she "suffered from episodes of fainting, dizziness, loss of sleep, nightmares, indigestion, depression, anxiety, and other physical and mental injuries on account of the severe lead poisoning of her minor child from ingesting lead paint and being exposed to lead paint in the premises ...." Pierre thus seeks to recover for emotional distress arising from the lead poisoning of her child. This emotional distress is not compensable in the present state of Massachusetts tort law.

In *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982), the Supreme Judicial Court held that "in order for ... plaintiffs to recover for negligently inflicted emotional distress, [they] must allege and prove [they] suffered physical harm as a result of the conduct which caused the emotional distress ... [A] plaintiff's physical harm must either cause or be caused by the emotional distress alleged ...". *Id.*, 437 N.E.2d at 181. The term "physical harm" denotes "harm to the bodies of the plaintiffs". *Id.* at 175 n. 4. In my opinion, plaintiff Pierre's alleged fainting, dizziness and loss of sleep do not constitute the physical damage required by *Payton*. As a result, Pierre may not seek to recover damages for her emotional distress.

Even if the physical harm requirement of *Payton* were met, however, plaintiffs' proposed amendment would fail to state a claim. Although the Massachusetts courts have not addressed the issue of whether a parent may recover for emotional distress stemming from the negligently induced illness of a child, I recently faced this question in a case in which it is alleged that children became ill and died from leukemia as a result of exposure to chemicals which contaminated the water supply. After reviewing the relevant case law, I determined that Massachusetts does not recognize such a claim. *Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1228–30 (D.Mass. 1986). That holding applies here, where plaintiff's emotional distress arises from the lead poisoning of her child as a result of the allegedly negligent conduct of defendants.

Accordingly, plaintiffs' motion to amend the complaint to allege negligent infliction of emotional distress is denied as futile. *Jackson v. Salon*, 614 F.2d 15, 17 (1st Cir.1980).

*Intentional or Reckless Infliction of Emotional Distress.*

To state a claim for intentional infliction of emotional distress, plaintiff must show: (1) that defendants intended to inflict emotional distress or that they knew or should

have known that emotional distress was the likely result of their conduct; (2) that the conduct was "extreme and outrageous", was "beyond all possible bounds of decency", and was "utterly intolerable in a civilized community"; (3) that defendants' actions were the cause of plaintiff's distress; and (4) that plaintiff's emotional distress was "severe" and of such a nature "that no reasonable man could be expected to endure it". *Agis v. Howard Johnson Company*, 371 Mass. 140, 355 N.E.2d 315, 319 (1976). A defendant's failure to act may support liability. Where there is a duty to act, extended inaction may constitute such a "pattern of indifference" as to constitute conduct "beyond all possible bounds of decency". *Simon v. Solomon*, 385 Mass. 91, 431 N.E.2d 556, 561–62 (1982). Plaintiffs have alleged the four elements required under *Agis*. Proposed Third Amended Complaint ¶¶ 40–43.

However, the mere allegation that defendants' conduct is actionable under *Agis* is not sufficient to compel amendment of the complaint. "It is the responsibility of the court in the first place to determine whether the conduct alleged may reasonably be viewed as extreme, outrageous and beyond all possible bounds of decency". *Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F.Supp. 230, 236 (D.Mass.1983) (citing *Boyle v. Wenk*, 378 Mass. 592, 598 n. 11, 392 N.E.2d 1053, 1057 n. 11 (1979)). I do not believe the conduct alleged here constitutes either the systematic harassment or the single but dramatically cruel incident the Massachusetts courts have found to be sufficiently "outrageous" to sustain a claim for reckless infliction of emotional distress. *See id.*

Plaintiffs rely on *Simon v. Solomon, supra*, in which the Supreme Judicial Court held that a landlord who failed to keep an apartment free of floods of water and sewage despite repeated complaints was liable for reckless infliction of emotional distress. The court's holding rested on the jury's implicit finding that the defendant "violated its duty to [plaintiff] recklessly, by outrageous omission to act" and thereby caused plaintiff's distress. 431 N.E.2d at 562. *Simon* does not control this case for two reasons. First, the landlord's duty relied on in *Simon*—the implied warranty of habitability—was well established and ongoing. In this case, HUD's alleged duty is not that of a landlord but of a vendor. I have already determined that the warranty of habitability is inapplicable to sales of realty. Memorandum and Order pp. 3–6 (March 7, 1985). The two claims which survived defendants' motion to dismiss are based on express warranty (of one year duration) and negligence (under the "good samaritan" or "gratuitous undertaking" doctrine). *Id.* at 3, 9. Neither claim is founded on a duty as clear or as ongoing as that in *Simon*. I note that the injuries complained of occurred after the express warranty expired because plaintiff Nathania Lescouflair was born more than two years after plaintiff Pierre purchased the house.

Second, the plaintiff in *Simon* had notified the landlord of the defect repeatedly, and the landlord's liability for plaintiff's emotional distress arose from the long-term pattern of indifference to the complaints. *See* 431 N.E.2d at 562–63. In this case, plaintiffs did not notify defendants of the alleged defect until after the injury which caused plaintiff Pierre's distress had occurred. To the extent Pierre alleges that her distress was aggravated by defendants' slowness in responding to her notices of claim and eventual denial of liability, the distress is not related to any injury resulting from defendants' conduct. Accordingly, plaintiffs' motion to amend the complaint to add a cause of action for reckless infliction of emotional distress also must be denied as futile.

In summary, plaintiffs' motion to amend is DENIED. Defendants shall answer the Second Amended Complaint, insofar as it stands after my memorandum and order of March 7, 1985, within twenty days of the date of this opinion.

## APPENDIX C

MEMORANDUM AND ORDER ON DE-
FENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

June 2, 1988

This case arises out of the sale of a home in 1978 by the United States Department of Housing and Urban Development ("HUD") to plaintiff Gladys Pierre. Plaintiffs assert that defendant's failure to remove, cover, inspect for, or warn of lead-based paint on the premises of the house caused injury to Ms. Pierre and her minor daughter.

On May 5, 1978, Gladys Pierre and HUD, through its agents and employees, signed a HUD Standard Retail Sales Contract establishing that HUD would sell to Ms. Pierre a two family house in Dorchester, Massachusetts. HUD agreed to repair the home and provided Ms. Pierre with repair schedules for work to be performed. It was agreed that the repairs would be performed according to HUD standards specified in its National Specification System and would comply with the City of Boston and Commonwealth of Massachusetts ordinances and laws regulating residential housing in Boston.

On June 29, 1978, HUD conveyed the property to Ms. Pierre by Quitclaim Deed. After that date, HUD performed repairs and renovations on the home, including, but not limited to, painting the interior and exterior of the house. The work was substantially completed by November 1978.

Plaintiff Nathania Lescouflair, Ms. Pierre's daughter, was born in 1980. In the fall of 1982, Ms. Pierre discovered that her daughter was suffering from lead poisoning as a result of inhaling or ingesting lead-based paint that had been used on the house prior to the purchase in 1978. Plaintiffs allege that Nathania suffered organic brain damage which "will retard her future educational, social, vocational and intellectual development." They have brought this action for damages.

The complaint began as an action in six counts. On March 7, 1985, I dismissed plaintiffs' claims under the Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. § 4821 *et seq.*, the National Housing Act, 12 U.S.C. § 1701 *et seq.*, M.G.L. c. 111, § 197, and for breach of implied warranty and negligent and intentional infliction of emotional distress. Count VI of the complaint, in which plaintiffs seek a declaratory judgment that the Department of Housing and Urban Development violated federal law, will be dismissed because I lack jurisdiction to hear that claim. *See Commonwealth v. Departmental Grant Appeals Board*, 815 F.2d 778 (1st Cir.1987) (a district court does not have jurisdiction over a request for declaratory judgment when the "primary objective" is monetary relief from the United States in an amount in excess of $10,000).

Presently before me is defendant's motion to dismiss or for summary judgment on the counts remaining in the action. Because a number of affidavits and exhibits have been filed, I will treat the motion as one for summary judgment. Summary judgment is appropriate if there exist no material issues of fact in dispute. Fed.R. Civ.P. 56(c).

Two counts remain in plaintiffs' amended complaint. In Count I, plaintiffs allege that defendant's failure to warn Ms. Pierre of the presence of lead paint on the premises of the house, or its failure to remove or cover the paint, constitutes a breach of the express warranty contained in the Standard Retail Sales Contract signed by both parties. Count V of the complaint is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1982), and states that the defendant is liable under the "good samaritan" or "gratuitous undertaking" doctrine of Massachusetts tort law. I will address each claim separately.

*Count I: Breach of Express Warranty*

Plaintiffs allege that HUD's failure to warn of or remove the lead paint that was present in her home constituted a breach of express warranty contained in the Standard Retail Sales Contract signed by both parties. They premise their claim on two paragraphs which appear on the reverse side of the contract.

In paragraph 3 on the reverse side of the contract, the seller warrants that it is conveying "good merchantable title" to the real estate. Plaintiffs maintain that the seller is thereby "unconditionally warranting the property to the buyer." This is an incorrect construction of the paragraph. By warranting that it is conveying "good merchantable title," the seller is making representations about the chain of title of the real estate; it is not guaranteeing the condition of the home. *See Brown v. Kelley & Picerne, Inc.,* 518 F.Supp. 730, 732 (D.Mass.1981), *aff'd,* 676 F.2d 682 (1st Cir. 1982) (under Massachusetts law, "good and clear record and marketable title" means title which is free from reasonable doubt in law and in fact). Therefore, there has been no breach of this paragraph of the contract.

Paragraph 11 on the reverse side of the contract contains an express warranty that:

> The Seller will correct any structural defect in the dwelling or defects in its heating or central cooling, plumbing, and electrical systems .... which occurs within one (1) year after the sale closing, provided the Purchaser, upon discovery of such defect, promptly notifies the Seller in writing.

Plaintiff claims that HUD breached this warranty by failing to respond when she notified them within one year of the sale closing that paint was peeling in the house. As defendant points out, however, the warranty in paragraph 11 covers only "structural defects." This term, as used in ordinary parlance and as defined,[1] does not include defects in paint. Because the phrase is unambiguous, there is no need to go beyond the terms of the contract to construe its meaning. Defendant's motion for summary judgment on Count I of the amended complaint will be allowed.

*Count V: Negligence*

Plaintiffs have brought a negligence claim against the defendant under the Federal Tort Claims Act ("FTCA"), which waives the government's sovereign immunity to a limited extent, exposing it to suit "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (1982). In paragraph 35 of their amended complaint, plaintiffs allege that defendant breached its duties by negligently and carelessly (a) failing to warn Pierre of the existence of a concealed dangerous condition, (b) after undertaking to inspect, supervise and paint the interior and exterior surfaces of the premises, failing to exercise reasonable care in performing the undertaking, (c) failing to remove or cover the lead-based paint surfaces after notice of the defect, (d) failing to comply with duties under 42 U.S.C. § 4822, and (e) failing to comply with duties under M.G.L. c. 111, § 190 *et seq.*

In order to be liable under the FTCA, the government must have breached a duty which is established by local law for private actors. The United States cannot be held liable under the FTCA for a duty imposed on it by federal statute. *Zabala Clemente v. United States,* 567 F.2d 1140, 1150 (1st Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Therefore, section (d) of paragraph 35 of the amended complaint does not state a claim. The claim against the defendant pursuant to M.G.L. c. 111, § 190 *et seq.* has already been dismissed, and is no more viable when set forth in a negligence context. Therefore, section (e) of paragraph 35 does not state a claim. Finally, plaintiffs have not established that defendant had any duty, imposed on private actors, to warn Pierre of the existence of the lead-based paint, or to remove the paint once notified of its existence. Therefore, sections (a) and (c) do not state actionable claims.

The crux of plaintiffs' negligence claim is paragraph (b), in which plaintiffs have alleged the requisite elements of the "good samaritan" or "gratuitous undertaking" doctrine of tort law.[2] It is an established principle in tort law that a duty voluntarily assumed must be performed with due care.

---

1. "Structural" is defined as: 1. of or relating to structure .... 2. of or relating to the load-bearing members or scheme of a building as opposed to the screening or ornamental elements.

*Webster's Third New International Dictionary* 2266 (1971).

2. Negligent Performance of Undertaking to Render Services:

*Black v. New York,* 193 Mass. 448, 79 N.E. 797 (1907). *See also Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331, 336 (1983). Plaintiffs argue that defendant undertook to repair their home, including painting the interior and exterior of the house, that defendant failed to exercise reasonable care in the performance of that undertaking, and that plaintiffs suffered harm because of their reliance on defendant's activities.

Defendant argues that it is exempt from liability under the "discretionary function" exemption to the FTCA. The Federal Tort Claims Act excludes any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1982). The defendant argues that any challenge to HUD's policy of lead-based paint removal, or to its implementation of that policy, is exempt from challenge under the FTCA.

In *United States v. S.A. Empesa [Empresa] de Viacao Aerea Rio Grandense,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984) *("Varig Airlines"),* the Supreme Court stressed that the discretionary function exemption was meant to exempt from the FTCA claims arising from the regulatory activities of federal agencies. In that case, plaintiffs sought damages from the United States under the FTCA for wrongful death and a destroyed aircraft, based on the alleged negligence of the Civil Aeronautics Agency in issuing a safety certificate for the aircraft. The Supreme Court noted that Congress had delegated to the Secretary of Transportation the duty to promote safety in air transportation by promulgating reasonable rules and regulations governing the inspecting, servicing, and overhaul of civil aircraft. *Varig,* 467 U.S. at 816, 104 S.Ct. at 2765. Because the promulgation of those rules and regulations involved policy decisions, the system of compliance review developed by the Secretary fell within the "discretionary function" exemption of the FTCA.

Furthermore, the Court found that the actions of the agency employees in implementing the safety policies were also protected by the discretionary function exemption of the FTCA. Under the safety policy in effect, engineers and inspectors were specifically empowered to make policy judgments regarding the degree of confidence that they would place in a given manufacturer of airplanes.[3] Thus, the Court concluded that their actions were also protected by the discretionary function exemption.

By holding that the actions of both the Secretary and the employees were protected by the discretionary function exemption, the Supreme Court reaffirmed the holding of *Dalehite v. United States,* 346 U.S. 15, 35-36, 73 S.Ct. 956, 967-68, 97 L.Ed. 1427 (1953), that the exemption includes not only the "initiation" of programs or activities, but also "determinations made by executives or administrators in establishing plans, specifications or schedules of operations." The Court enumerated two principles to be used in applying *Dalehite:*

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case....

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965).

**3.** For instance, the manual provided:

> Differences between manufacturers require that the conformity program be adjusted to fit existing conditions. In the case of an inexperienced manufacturer whose ability is unknown, it may be necessary to conduct a high percentage of conformity inspections until such time as the [CAA] inspector feels he can safely rely to a greater degree upon the company inspectors. He may then gradually reduce his own inspection or witnessing accordingly.

*Varig,* 467 U.S. at 817, 104 S.Ct. at 2766.

Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Varig*, 467 U.S. at 813–814, 104 S.Ct. at 2764.

In this case, the decision by the Secretary of HUD to implement a particular policy of lead-based paint removal falls within the discretionary function exemption to the FTCA. But plaintiff does not challenge the policy itself; rather, she alleges that HUD employees were negligent in their implementation of the policy. To determine whether the government can be held liable for these activities, I must look to the "nature of the conduct" performed by the HUD employees.

The regulations and manuals which implement HUD's lead-based paint removal policy do not contemplate a policy-making discretionary function for those at the operational or implementational level. The rules and regulations clearly outline the situations in which lead-based paint must be removed. *See* 24 C.F.R. §§ 35.50–.56. Plaintiffs allege that defendants acted negligently by failing to follow their own regulatory guidelines. Therefore, this case is distinguishable from *Varig*, where the employees were making independent policy determinations, and were not bound by strict regulatory directives.

This case is similarly distinguishable from *K.W. Thompson Tool Co., Inc. v. United States*, 836 F.2d 721 (1st Cir.1988), the most recent First Circuit case analyzing the discretionary function exemption. In that case, the breaches of duty alleged were described by the court as "failure to properly train and supervise EPA Personnel and the failure to use valid scientific data in issuing NPDES permits." *Thompson Tool Co.*, 836 F.2d at 727. The court concluded that those duties involved the exercise of discretion. It further noted: "It is important to point out what the complaint does not allege. There is no claim that any section of the [Clean Water Act] or any EPA regulations issued thereunder were violated by the defendants." *Id.*

Plaintiffs in this case allege that mandatory regulations were violated by HUD employees. The failure to carry out a mandatory directive does not involve the exercise of discretion:

In other words, if a governmental actor deliberately, after weighing the alternatives, decides upon a course of action that injures another, that person has no cause of action under the FTCA. However, if the actor simply through negligence or oversight does the wrong thing, suit by a person injured thereby will not be barred by the discretionary function exception.

*Wells v. United States*, 655 F.Supp. 715, 721 (D.D.C.1987). *See also Merklin v. United States*, 788 F.2d 172, 175 (3d Cir. 1986) (distinguishing case in which discretionary function exemption did not apply on grounds that no policy judgment was implicated). Because the alleged actions of the HUD employees in this case fall into the latter category, the suit is not barred by the discretionary function exemption to the FTCA.

Having determined that plaintiffs' suit is not barred by the discretionary function exception to the FTCA, I now turn to the question of whether plaintiffs have properly supported their "good samaritan" claim. In order to prevail on that theory, plaintiffs must prove that HUD undertook to render services necessary for plaintiffs' protection, that HUD failed to exercise reasonable care in the performance of those services, and that plaintiffs suffered harm as the result of their reliance on HUD's undertaking. Restatement (Second) of Torts § 323 (1965). Defendant contends that plaintiffs cannot prevail on this theory as a matter of law.

Defendant argues first that plaintiffs have failed to show the existence of an "undertaking." Defendant asserts that HUD did not undertake completely to de-lead the property. This is correct. The parties agree, however, that HUD undertook to repair the home, and that these repairs included painting the interior and exterior of the house. What remains in dispute is whether in so doing, HUD under-

took to remove all "immediate hazards" from the premises. Plaintiff Pierre claims that she believed that to be the case, and her understanding is supported by HUD's own manual which states that repair programs shall be developed to place properties in a "safe and habitable condition," and to assure that no health hazard exists. U.S. Department of Housing and Urban Development, *Property Disposition Handbook: One to Four Family Properties* 3 (1970).

Furthermore, HUD undertook to paint the interior and exterior of plaintiffs' home, and an issue of material fact exists as to whether, in so doing, it also undertook to remove immediate lead paint hazards or to warn of their existence. Once again, HUD's own manual includes in the "interior finish" and "exterior finish" sections a reference to the elimination of the hazards of lead-based paint. U.S. Department of Housing and Urban Development, *Minimum Design Standards for Rehabilitation for Residential Properties* 8–1, 8–2 (1978). A jury could reasonably conclude that, in undertaking to repair or to paint the plaintiffs' house, HUD undertook to remove immediate lead-based paint hazards.

Furthermore, issues of material fact exist as to whether HUD performed its painting and repairs with due care. Plaintiff claims that HUD employees failed to inspect for or repair immediate lead-based paint hazards, as they are required to do by regulation. The facts about which areas of the house were painted by HUD, and which areas contained paint that was chipping or peeling, are in dispute. Similarly, whether the areas that were allegedly peeling at the time of the repairs caused the subsequent injury to plaintiff Lescouflair is a factual question that remains to be resolved.

Defendant argues that even if plaintiffs can prove the existence of an undertaking, the undertaking was performed gratuitously, and therefore defendant is only liable if its conduct can be described as "grossly negligent." *See Mullins v. Pine Manor College,* 449 N.E.2d at 336 n. 10 (Massachusetts imposes on gratuitous undertakings a duty to refrain from gross negligence). Defendant then argues that, as a matter of law, its conduct does not rise to the level of gross negligence. Gross negligence, however, is not necessarily the appropriate standard in this case. Because a jury could conclude that the repair work was not performed gratuitously, but rather was bargained for as part of the purchase price of the house, the appropriate standard may be simple negligence. In any event, the question of negligence is one of fact for the jury.

Finally, defendant argues that plaintiffs have not shown that they relied on defendant's undertaking. Defendant points to plaintiff Pierre's statements that she did not even know of the possibility of the existence of lead-based paint in the house. Defendant argues that if Mrs. Pierre did not know of the potential health hazard, she could not have relied on HUD to remove it. Plaintiff Pierre argues that she relied on defendants to remedy any immediate hazards in the home, and might have hired an inspector had HUD not represented that they would make all necessary repairs. Even though Ms. Pierre was not aware of the hazards of lead paint, and would not have hired an inspector specifically to test the paint, a jury could conclude that she relied on HUD's undertaking by failing to contract privately for a general inspection of the house. The questions of reliance and causation are therefore most appropriately left to the fact finder.

*Conclusion*

Defendant's motion for summary judgment on Counts I and VI of the amended complaint is ALLOWED. Defendant's motion for summary judgment on Count V of the complaint is ALLOWED except with respect to plaintiffs' claim under the "good samaritan" doctrine. Defendant's motion for summary judgment on plaintiffs' claim in Count V under the good samaritan doctrine is DENIED.

The clerk shall forthwith assign a date for a pretrial conference, to be followed promptly by trial.